**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|   |   |   |
|---|---|---|
| **KAREL ALVAREZ & JUAN TELLADO,** | : | **CIVIL ACTION** |
| _Individually and on behalf of all persons_ | : | |
| _similarly situated_, | : | |
| **Plaintiffs,** | : | **No. 16–2705** |
| | : | |
| **v.** | : | |
| | : | |
| **BI  INCORPORATED,** | : | |
| | : | |
| **Defendant.** | : | |

_____:

**Goldberg, J.**                                                                                                    **May 17, 2018**

## MEMORANDUM OPINION

This is a putative collective action for unpaid wages and overtime compensation under the Fair Labor Standards Act ("the FLSA"). Named Plaintiffs Karel Alvarez and Juan Tellado are an employee and former employee of Defendant BI Incorporated. Named Plaintiffs claim— on behalf of themselves and other similarly situated employees and former employees—that Defendant failed to pay them wages and overtime compensation for certain compensable work, in violation of the FLSA.

Pending are: (1) Plaintiffs' Motion to Conditionally Certify an FLSA Collective Action and to Facilitate Notice (Plaintiffs' "Notice Motion"); (2) Defendant's Motion for Partial Summary Judgment; (3) Plaintiffs' Motion to Stay or Deny Defendant's Motion for Partial Summary Judgment (Plaintiffs' "Rule 56(d) Motion"); and (4) Plaintiffs' Motion for Equitable Tolling. For the reasons that follow, Plaintiffs' Notice Motion and Rule 56(d) Motion will be granted; Defendant's Partial Summary Judgment Motion will be denied without prejudice; and Plaintiffs' Motion for Equitable Tolling will be denied.

1

# I. FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken from Plaintiffs' Class and Collective Action Complaint, Defendant's Answer, the briefs filed in connection with the instant motions, and the exhibits and declarations attached thereto.

## A. *Factual Background*

Defendant, BI Incorporated, provides products and services to government agencies that monitor parolees, probationers, pretrial defendants, and the like. In 2004, Defendant was awarded a contract by U.S. Immigration and Customs Enforcement ("ICE") to monitor aliens released from ICE detention pending immigration proceedings. (This program, called the "Intensive Supervision Appearance Program," is referred to hereinafter as "ISAP," and Defendant's contract with ICE is referred to as the "ISAP Contract.") (Compl. ¶ 17; Answer ¶ 17; Dep. of Jeffrey McGee, Pls.' Mem. in Supp. of Notice Mot., Ex. 4 (hereinafter cited as "McGee Dep.") at 6:12-13, 15:8-16:25; Pls.' Mem. in Supp. of Notice Mot., Ex. 6.)[1]

Under the ISAP Contract, Defendant is responsible for completing specified tasks to monitor the aliens that ICE designates for ISAP supervision. (Such aliens are referred to as ISAP "participants.") The required tasks include installing electronic monitoring equipment on participants and visiting with participants—both at the participants' homes and at Defendant's offices. (Pls.' Mem. in Supp. of Notice Mot., Ex. 6.)

To carry out these tasks, Defendant has employed a number of "ISAP Case Specialists." During the time period at issue, Defendant employed more than 400 ISAP Case Specialists in approximately 61 offices, located in 32 states. Each of these offices was led by an ISAP Program

---

[1] ICE and Defendant have since renewed the ISAP Contract twice, first in November 2009 and again in November 2014, and the contract is up for renewal again in 2019. (McGee Dep. 15:8-16:25.)

Manager, who supervised the ISAP Case Specialists assigned to that office. (Compl. ¶ 8; Answer ¶ 8; McGee Dep. 60:23-61:2.)

Named Plaintiffs Karel Alvarez and Juan Tellado have worked for Defendant as ISAP Case Specialists. Named Plaintiff Alvarez was employed in Defendant's Philadelphia office from July 2012 through November 2015, and has since been employed in Defendant's office in Newark, New Jersey. Named Plaintiff Tellado was employed in Defendant's Philadelphia Office from January 2014 through January 2015. (Compl. ¶¶ 21-22; Answer ¶¶ 21-22.)

**B.**     ***Procedural History of This Collective Action***

Plaintiffs initiated this action on June 2, 2016, by filing a Class and Collective Action Complaint, claiming that Defendant failed to pay them—and other ISAP Case Specialists throughout the United States—wages and overtime compensation, in violation of the FLSA and the Pennsylvania Minimum Wage Act.[2]

Specifically, Plaintiffs allege that Defendant failed to pay them for three categories of compensable work. First, Plaintiffs allege that they did various work "off-the-clock"—by, for example, working though lunch breaks—and that such off-the-clock work was required to meet the demands created by their heavy workload. Second, Plaintiffs claim that Defendant failed to compensate them for time that they were "on call"—that is, time that they were required to be prepared to respond within minutes to an alert triggered by an ISAP participant. And third, Plaintiffs assert that Defendant failed to compensate them for certain time related to visiting participants at their homes (referred to as "home visits"). Specifically, this was time spent commuting, in Defendant's vehicles, from the ISAP Case Specialists' own homes to the residence of the first ISAP participant to be visited during a given day; time spent reverse

---

[2] Plaintiffs have also asserted an unjust enrichment claim based on Defendant's alleged failure to pay wages and overtime compensation.

commuting home after a day's final home visit; and tasks undertaken in preparation for home visits, such as mapping out a route to the participants' homes, and uploading necessary information into their work phones. (Compl. ¶¶ 32-67.)

After Defendant answered the Complaint, I held a Rule 16 Conference, and on November 4, 2016, issued a Scheduling Order providing limited discovery on the issue of conditional certification of a collective action under the FLSA. The Scheduling Order allowed Plaintiffs to "serve written discovery requests and take one (1) Rule 30(b)(6) deposition of Defendant's corporate designee," and specified that both the "deposition and discovery requests shall be limited to the issue of conditional certification under the FLSA." (11/4/16 Or., Doc. No. 23.)

On April 3, 2017, Plaintiffs filed their Notice Motion, seeking conditional certification of a collective action under the FLSA and the issuance of a court-approved notice to other current and former ISAP Case Specialists. In addition to opposing Plaintiffs' Notice Motion, Defendant filed a Motion for Partial Summary Judgment on Plaintiffs' claims regarding home visits. Plaintiffs responded with a motion under Federal Rule of Civil Procedure 56(d), urging me to defer consideration of Defendant's Partial Summary Judgment Motion until after discovery on the merits.

Since the filing of the Complaint in June 2016, ten additional ISAP Case Specialists have opted in to this collective action, bringing the total number of Plaintiffs to twelve. In November 2017, five months after filing their Notice Motion, Plaintiffs filed a Motion for Equitable Tolling, requesting that the statute of limitations for any additional potential opt-in plaintiffs be tolled from the date of the filing of their Notice Motion, April 3, 2017, until ten days after my decision on the Notice Motion. Defendant opposes such tolling.

For the reasons that follow, I conclude that Plaintiffs' FLSA claims should be conditionally certified as a collective action, and that notice should be sent to potential opt-in plaintiffs. I further conclude that Defendant's Motion for Partial Summary Judgment is premature, as discovery on the merits of Plaintiffs' claims has not been completed. Finally, I conclude that equitable tolling of the statute of limitations for potential opt-in plaintiffs is not appropriate in this case.

## II.   DISCUSSION

### A.   *Conditional Certification of a Collective Action*

"The FLSA establishes federal minimum wage, maximum hour, and overtime guarantees that cannot be modified by contract." Genesis Healthcare Corp v. Symczyk, 569 U.S. 66, 69 (2013); see also 29 U.S.C. § 201 et seq. Employees alleging that their employer violated these guarantees by failing to pay wages and overtime compensation may sue on "behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). "A suit brought on behalf of other employees is known as a 'collective action.'" Genesis Healthcare Corp., 569 U.S. at 69.

A collective action under the FLSA differs from a class action under Federal Rule of Civil Procedure 23, in that "the mere presence of [collective action] allegations does not automatically give rise to the kind of aggregate litigation provided for in Rule 23." Halle v. W. Penn Allegheny Health Sys. Inc., 842 F.3d 215, 225 (3d Cir. 2016). "Rather, the existence of a collective action depends upon the affirmative participation of opt-in plaintiffs," who must, to pursue their claims, affirmatively choose to join in the collective action by filing a written opt-in notice with the court. Id.; see also 29 U.S.C. § 216(b) (providing that "[n]o employee shall be a

party plaintiff to [a collective] action [under the FLSA] unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought").

The FLSA does not define the term "similarly situated," nor does it specify a procedure for determining whether the employees that a named plaintiff seeks to include in a collective action are similarly situated. But the United States Court of Appeals for the Third Circuit has approved a "practical approach to managing FLSA collective actions" that consists of two steps. Halle, 842 F.3d at 224.

At the first step, a court determines whether a collective action should be "conditionally certified." Halle, 842 F.3d at 224. In order to obtain conditional certification, the named plaintiffs need only make "a modest factual showing—something beyond mere speculation—to demonstrate a factual nexus between the manner in which the employer's alleged policy affected him or her and the manner in which it affected the proposed collective action members." Id. (internal quotation marks omitted) (citing Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 536 n.4 (3d Cir. 2012)).

Because this determination occurs "early in the litigation when minimal evidence is available to the court," the evidentiary standard is "extremely lenient." Viscomi v. Clubhouse Diner, No. 13-cv-4720, 2016 WL 1255713, at *3 (E.D. Pa. Mar. 31, 2016). "The Court does not evaluate the merits of a case when ruling on a motion for conditional certification," but simply determines whether the named plaintiffs have "provide[d] modest evidence that the proposed [collective] consists of similarly situated employees who were collectively the victims of a single decision, policy, or plan." Id. (internal quotation marks omitted); see also Bamgbose v. Delta-T Group, Inc., 684 F. Supp. 2d 660, 664 n.4 (E.D. Pa. 2010) (noting that, when deciding a motion

for conditional certification, "[t]he court does not make any credibility determinations or findings of fact when presented with contrary evidence").

If a court determines that the named plaintiffs have met this lenient standard, and conditionally certifies a collective action, "[t]he sole consequence . . . is the dissemination of court-approved notice to potential collective action members." Halle, 842 F.3d at 224 (explaining that "[c]onditional certification, therefore, is not a true certification, but rather an exercise of a district court's discretionary authority to oversee and facilitate the notice process").

Following notice to potential opt-in plaintiffs and remaining discovery, a collective action moves to the second step: final certification. Halle, 842 F.3d at 226. At this stage, "after discovery, and with the benefit of a much thicker record than it had at the [conditional certification] stage, a court . . . makes a conclusive determination as to whether each plaintiff who has opted in is in fact similarly situated to the named plaintiff[s]." Symczyk v. Genesis Healthcare Corp., 656 F.3d 189, 192 (3d Cir. 2011), rev'd on other grounds, 569 U.S. 66 (2013). "This second stage is less lenient, and the plaintiff bears a heavier burden." Id.

The case before me is currently at the first of these two stages: conditional certification. Having completed limited discovery relevant to whether the Named Plaintiffs—Alvarez and Tellado—are similarly situated to other current and former ISAP Case Specialists, Plaintiffs seek conditional certification of a "collective"[3] and approval of a notice to be sent to members of that collective. Accordingly, I must determine whether Plaintiffs have met their modest evidentiary burden of demonstrating that they are similarly situated to the members of the collective that they seek to conditionally certify.

---

[3] While some courts use the term "class" to refer to the group of employees that a named plaintiff seeks to conditionally certify, I will use the term "collective" to highlight that this is a collective action under the FLSA, not a class action under Rule 23.

Plaintiffs seek conditional certification of the following collective:

All current and former ISAP Case Specialists employed by BI Incorporated who performed work in the United States between [insert date three years prior to the date that the Court issues an Order granting Conditional Certification but including 60 days of agreed upon tolling][4] and the present.

Plaintiffs contend that they are similarly situated to other ISAP Case Specialists nationwide because all ISAP Case Specialists share the same job responsibilities and pay, receive the same training, and are subject to the same management structure. In addition to sharing these general characteristics, Plaintiffs contend that for each of the types of work they claim went unpaid—off-the-clock work, on-call time, and certain time related to home visits—ISAP Case Specialists were subject to the same official policies and unofficial practices.

Plaintiffs have provided ample evidence that ISAP Case Specialists nationwide shared the same job responsibilities, pay, training, and management structure. As to job responsibilities, Plaintiffs have provided a document, produced by Defendant, that sets out the primary job responsibilities of ISAP Case Specialists. (Pls.' Mem in Supp. of Notice Mot., Ex. 7.) Regarding pay, Plaintiffs have pointed to Defendant's corporate representatives' testimony that ISAP Case Specialists nationwide were hourly employees eligible for overtime and subject to uniform pay policies, such as "regular pay," "overtime pay" and "on-call pay." (McGee Dep. 140:13-19; Dep. of Heather Chico, Pls.' Mem in Supp. of Notice Mot., Ex. 12 (hereinafter cited as "Chico Dep.") at 44:12-19.) As to training, Defendant's corporate representatives testified that ISAP Case Specialists all receive the same training, and were subject to the same employee handbook and standard operating procedures, which materials Defendant produced in discovery. (McGee Dep. 197:23-198:2; Dep. of Nicole Keith, Pls.' Mem in Supp. of Notice Mot., Ex. 11 (hereinafter cited

---

[4] This bracketing is in the original of Plaintiffs' Memorandum in Support. As Plaintiffs note, the parties agreed to toll the statute of limitations for any additional opt-in plaintiffs by 60 days, as part of their agreement to participate in a settlement conference. (Pls.' Mem. in Supp. of Notice Mot. 5-6.)

as "Keith Dep.") at 30:21-31:1, 56:10-13, 116:18-117:15; Pls.' Mem in Supp. of Notice Mot., Exs. 10, 13, 29.) And finally, as to how ISAP Case Specialists were managed, Plaintiffs provided evidence of a uniform management structure in which ISAP Case Specialists in each office answer to their office's ISAP Program Manager, who, in turn, reports to one of several Regional Directors, who answers to a nationwide ISAP director. (McGee Dep. 60:19-61:7; Pls.' Mem in Supp. of Notice Mot., Ex. 9.) These similar characteristics allowed Defendant to shift ISAP Case Specialists from one office to another to meet staffing needs. (McGee Dep. 217:16-20; Keith Dep. 119:7-11.)

Defendant does not appear to dispute that ISAP Case Specialists throughout the nation are similarly situated in these general ways. Instead, Defendant contends that as to Plaintiffs' three uncompensated work claims—off-the-clock work, on-call time, and certain time related to home visits—ISAP Case Specialists were subject only to lawful official policies, and that Plaintiffs have failed to show an unlawful, unofficial practice applicable nationwide. However, for the reasons set out below, I conclude that Plaintiffs have satisfied their modest evidentiary burden as to each of their three claims.

      1.    <u>Off-the-Clock Work</u>

Plaintiffs contend that they often worked off-the-clock, including through their lunch periods and after regular business hours, and that Defendant did not compensate them for this time. In contending that ISAP Case Specialists throughout the nation are similarly situated in this regard, Plaintiffs acknowledge that Defendant had an official policy prohibiting off-the-clock work. However, Plaintiffs contend that ISAP Case Specialists nationwide routinely did work off-the-clock as a result of two uniform practices: (1) understaffing of Defendant's offices, and (2)

payment of bonuses to ISAP Program Managers based, in part, on how little overtime was paid to ISAP Case Specialists.

a.     *Understaffing*

First, Plaintiffs point to evidence that Defendant's offices throughout the nation were understaffed. Defendant's corporate representative testified that the ISAP Contract called for Defendant to maintain certain minimum ratios of ISAP Case Specialists to ISAP participants, and that Defendant frequently failed to satisfy these staffing requirements. For example, Defendant's corporate representative acknowledged that the ISAP Contract in place after November 2014 required Defendant to employ at least one ISAP Case Specialist for every 100 ISAP participants, and that Defendant fell short of this staffing requirement "a good bit," in light of the "explosive growth" of ISAP, as well as delays in obtaining security clearances necessary for newly-hired ISAP Case Specialists to begin work.   (McGee Dep. 209:22-210:23, 213:9-214:7.)

Plaintiffs contend that the shortage of ISAP Case Specialists was particularly significant because, under the ISAP Contract, ISAP Case Specialists were required to conduct certain tasks within certain time frames. Evidence in the record supports Plaintiffs' contention, at least for the ISAP Contract applicable from November 2009 through November 2014. Under that contract, for example, ISAP Case Specialists were required to conduct home visits at certain specified intervals—such as every two weeks, or every four weeks, depending on the status of the particular participant's immigration proceedings. (Ex. 4, McGee Dep. 70:11-71:7.) Plaintiffs contend that these uniform and inflexible requirements, combined with understaffing nationwide, resulted in ISAP Case Specialists having more work than could be completed within the 40-hour workweek, thus necessitating off-the-clock work.

Evidence of understaffing across a collective of employees can support conditional certification of a claim for uncompensated off-the-clock work. See, e.g., Pearsall-Dineen v. Freedom Mortg. Corp., 27 F. Supp. 3d 567, 571 (D.N.J. 2014) (granting conditional certification where plaintiffs alleged that employer "imposed 'production requirements' on [employees] that required them to work in excess of forty hours per week," and where these allegations were supported by declarations from multiple opt-in plaintiffs); Pereira v. Foot Locker, Inc., 261 F.R.D. 60, 64 (E.D. Pa. 2009) (granting conditional certification where employees alleged that their employer had an "insufficient labor budget . . . such that hours and overtime [were] regularly unpaid to retail employees who must work off-the-clock to perform basic job functions," and where employees supported these allegations with evidence that employees regularly punched out before finishing work).

As in Pearsall-Dineen and Pereira, Plaintiffs here have alleged that ISAP Case Specialists were effectively required to work off-the-clock to complete necessary work, and have supported these allegations with declarations from employees stating that they did, in fact, work off-the-clock to complete required work. And surpassing Pearsall-Dineen and Pereira, Plaintiffs have provided at least some evidence to substantiate their claims that there was a shortage of ISAP Case Specialists, in the form of Defendant's corporate representative's testimony that Defendant frequently fell short of staffing requirements set by the ISAP Contract.

Defendant contends that Plaintiffs have not produced evidence connecting off-the-clock work to understaffing, because they have not, for example, "provided evidence to describe the mix or type of participants they were assigned, that they were assigned a participant mix or type that would . . . result in a higher workload, or that Defendant maintained a policy permitting only a set number of hours per day or week." (Def.'s Opp'n to Pls.' Notice Mot. 23.) But both the

Named Plaintiffs and multiple Opt-In Plaintiffs described their inability to complete required tasks, and how that inability was attributable to the number of participants that they were assigned. For example, Named Plaintiff Tellado, who worked in Defendant's Philadelphia office, indicated that he worked off-the-clock "due to the volume of his caseload," and "the inability to complete assigned tasks within the allotted time frames." (Pl. Tellado's Resps. to Interrogs., Pls.' Mem. in Supp. of Notice Mot., Ex. 23 at 7-8.) Likewise, one Opt-In Plaintiff, Veronica Acosta, who worked in at least six of Defendant's offices (Miami; Orlando; Atlanta; New Orleans; Sacramento; Fairfax, Virginia; and Miramar, Florida) stated that she worked off-the-clock because she had more work than she could complete in the 40-hour work week. (Decl. of Veronica Acosta, Pls.' Mem. in Supp. of Notice Mot., Ex. 15 (hereinafter cited as "Acosta Decl.") at ¶¶ 3-6.) And another Opt-In Plaintiff, Johanna Cabezas, who worked in four other offices in California (San Francisco, Los Angeles, Santa Ana, and San Bernardino) stated that she also worked off-the-clock through lunch "almost every day because [the offices] were short staffed." (Decl. of Johanna Cabezas, Pls.' Mem. in Supp. of Notice Mot., Ex. 17 at ¶¶ 3-6.)

Plaintiffs' declarations that they were required to work off-the-clock to complete work due to Defendant's failure to adequately staff its offices, in combination with Defendant's own testimony that staffing levels frequently fell below those required by the ISAP Contract, supports the existence of a common practice of off-the-clock work attributable to understaffing.

b. *Managerial Bonuses Based on Overtime Pay*

Second, Plaintiffs have provided evidence that ISAP Program Managers—who supervised Defendant's offices and the ISAP Case Specialists employed in them—were paid bonuses based, in part, on how much overtime compensation was paid. Specifically, Defendant's corporate representative testified that the amount of overtime compensation paid to ISAP Case

Specialists was "one of many" factors contributing to the "financial performance" of an office, which performance would be considered in determining an ISAP Program Manager's bonus. (McGee Dep. 241:7-22.)

Courts have held that such managerial bonuses can support conditional certification of off-the-clock work claims, because such bonuses may result in the performance of off-the-clock work. See, e.g., Vargas v. Gen. Nutrition Ctrs., Inc., No. 10-cv-867, 2012 WL 3544733, at *8 (W.D. Pa. Aug. 16, 2012) (conditionally certifying collective action for uncompensated off-the-clock work, and noting that "[a]n unwritten policy or practice resulting in unpaid overtime, such as making management pay dependent upon meeting hours targets may be actionable under the FLSA"); Maddy v. Gen. Elec. Co., 59 F. Supp. 3d 675, 683 (D.N.J. 2014) ("Courts in this Circuit have conditionally certified collective actions in many cases where plaintiffs allege that an unwritten policy or practice led to off-the-clock work, particularly where that unwritten policy related to certain time-based goals set by employers."). Thus, the fact that ISAP Program Managers' pay was, at least in some part, attributable to the amount of overtime compensation that was paid to ISAP Case Specialists supports Plaintiffs' position that ISAP Case Specialists were subject to a common practice resulting in off-the-clock work.

Plaintiffs' contention that off-the-clock work was pervasive is further supported by a report prepared by the U.S. Department of Labor following that agency's investigation into alleged FLSA violations by Defendant.[5] This investigation was initiated after one of the Opt-In

_____

[5] Defendant urges me not to consider the report for purposes of conditional certification, arguing that it is inadmissible and unreliable "hearsay built upon hearsay." (Def.'s Opp'n to Pls.' Notice Mot. 23.) I agree with Plaintiffs that evidence need not be admissible at trial to be considered at the conditional certification stage, where the evidentiary burden is slight, and where a court does not assess the merits but simply determines whether there is modest evidence of a common policy or practice. See, e.g., Bredbenner v. Liberty Travel, Inc., No. 09-cv-905, 2009 WL 2391279, at *2 n.1 (D.N.J. July 31, 2009) (declining to strike portions of declarations submitted in support of a motion for conditional certification and noting that "the standard for conditional certifications is lenient and does not address the merits of the case").

Plaintiffs in this action, Diane Dixon, submitted a complaint to the Labor Department. (Decl. of Diane Dixon, Pls.' Mem. in Supp. of Notice Mot., Ex. 19 at ¶ 14; Pls.' Mem. in Supp. of Notice Mot., Ex. 5 (cited hereinafter as "Labor Dep't FLSA Narrative Report."))

In the report, the Labor Department identified a number of "consistent practices that assisted in creating violations of . . . [the] FLSA." (Labor Dep't FLSA Narrative Report at 13.) These practices included:

- "Caps on overtime in [Defendant's] offices, which led to employees logging off the clock and subsequently continuing to work after being clocked out in order to complete work."

- "Employees working through lunch breaks to complete case notes and intakes of new ISAP participants. Employees are told not to go home until all work is completed."

- "Geographical challenges doing home visits, particularly when 20 or more home visits are required during an eight-hour shift. In some cases, some case managers had up to 40 home visits they were required to make on a given day during an eight-hour shift."

- "Case specialists maintaining high caseloads, in some cases having up to 120 clients."

- "Case specialists not being able to finalize their daily workload within an eight-hour shift."

- "Understaffing."

- "A review of employees' time records revealed numerous edits to employee time sheets to reflect no overtime or little overtime without the employees' knowledge. Program Managers had no plausible justification for these changes."

- "Program managers receiving a yearly bonus for keeping overtime down in each of the 42 offices across the United States."

- "Overtime issues being presented to the Regional Managers across the United States to no avail."

- "The enormous pressure put on case specialists to get the work done."

(Id. at 13-14.) These findings lend additional support to Plaintiffs' position that nationwide practices—including understaffing and managerial bonuses for minimizing overtime compensation paid—resulted in off-the-clock work. Accordingly, Plaintiffs have more than satisfied their modest evidentiary burden for conditional certification of their off-the-clock work claims.

      2.    <u>On-Call Time</u>

Separate and apart from their off-the-clock work claims, Plaintiffs contend that they and other ISAP Case Specialists were not fully compensated for time that they were required to be "on call."

During on-call time, ISAP Case Specialists were required to carry a pager or cell phone and to be prepared to respond to alerts within ten minutes. Such alerts could be triggered for a number of reasons, such as a malfunction of a participant's monitoring device or a participant leaving home after curfew. Depending on the type of alert triggered, an ISAP Case Specialist was required to take some action, such as phoning or visiting the participant, and then document that action. (McGee Dep. 98:3-99:7; Keith Dep. 87:14-88:16; Pls.' Mem. in Supp. of Notice Mot., Ex. 26; Decl. of Carisa Bauza, Pls.' Mem. in Supp. of Notice Mot., Ex. 16 at ¶ 12; Pls.' Mem. in Supp. of Notice Mot., Ex. 13, Doc. No. 35-13 at 34.)

An ISAP Case Specialist would be scheduled to be on call for a week-long shift. During an assigned on-call week, the ISAP Case Specialist was required to respond to alerts generated between the hours of 5:00 p.m. and 8:00 a.m. on weekdays, and 24 hours per day on weekends. The ISAP Case Specialist would continue to perform his or her regularly assigned duties during regular business hours. (Keith Dep. 42:1-7; McGee Dep. 240:3-24; Acosta Decl. ¶ 10.)

Plaintiffs contend that, under the FLSA, Defendant was required to compensate them for the entirety of the time that they were on call (not just the time they spent responding to alerts), because they were "engaged to wait" during such time. And Plaintiffs contend that they are similarly situated to other ISAP Case Specialists employed before March 2015,[6] because Defendant had, during this time period, a single, uniform pay policy setting out how ISAP Case Specialists would be compensated for on-call time, which policy did not compensate them for all on-call time.

Plaintiffs have provided Defendant's on-call pay policy, under which ISAP Case Specialists were compensated for on-call time in two ways. First, ISAP Case Specialists were paid for their on-call time at a rate of $120.00 per week, regardless of the alerts they received and responded to. Second, in addition to this weekly rate, Defendant's policy provided that ISAP Case Specialists would be compensated for "time spent on responding to a page or call . . . at the employee's base hourly rate plus overtime, if applicable." (Pls.' Mem. in Supp. of Notice Mot., Ex. 14.)

In contending that Plaintiffs' on-call claim should not be conditionally certified, Defendant primarily argues that its on-call policy, as described above, was legal. This argument is aimed at the merits of Plaintiffs' claim, and is not appropriate at the conditional certification stage. See, e.g., Viscomi, 2016 WL 1255713, at *5 (rejecting defendants' arguments at the conditional certification stage because they "address[ed] the *merits* of plaintiffs' claims, not the *commonality* of the alleged policies").

---

[6] In March 2015, Defendant transitioned on-call responsibilities from ISAP Case Specialists in its various offices to a single, dedicated "call center." (McGee Dep. 100:20-101:3.)

In addition to arguing that its policy regarding on-call pay was lawful, Defendant argues that Plaintiffs' "on-call theory . . . does not rest on common proof," because the Named and Opt-In Plaintiffs were inconsistent with one another as to: (1) whether they logged all of the time they spent responding to alerts, and (2) whether their Program Managers changed the time logged. This argument misses the point of Plaintiffs' claim—that, under the FLSA, Defendant was required to compensate ISAP Case Specialists for *all time spent on call*, not merely for time spent responding to alerts. Whether Plaintiffs were consistent in logging the time that they spent responding to alerts, and whether their ISAP Program Managers consistently modified any time logged, have no bearing on the commonality of Plaintiffs' claim that Defendant was required to pay ISAP Case Specialists for all time spent on call.

By pointing to Defendant's uniform policy for on-call pay, demonstrating that ISAP Case Specialists nationwide were not compensated for all time spent on call, Plaintiffs have met their modest evidentiary burden of showing that they were subject to a common policy that allegedly violates the FLSA.

3.    Time Related to Home Visits

Finally, Plaintiffs contend that Defendant failed to compensate them and other ISAP Case Specialists for time that they spent commuting, in Defendant's vehicles, from their own homes to the residence of the first participant visited on a given day, and the reverse commute back home following the final home visit for the day. Plaintiffs also point to tasks undertaken in preparation for home visits, such as mapping out a route to the participants' home, and uploading necessary information into work phones.

As with on-call time, Defendant had a uniform policy setting out how ISAP Case Specialists would be compensated for travelling to and from their homes to conduct a day's home visits. Under this policy, an ISAP Case Specialist commuting directly from his or her home to the first home visit for the day would be paid for any travel time exceeding his or her ordinary home-to-office commute. Likewise, an ISAP Case Specialist reverse commuting home from the last home visit for the day would be paid for any travel time exceeding his or her ordinary home-to-office commute. (Pls.' Mem. in Supp. of Notice Mot., Ex. 30, Doc. No. 37 at 123; Keith Dep. 61:15-62:14; McGee Dep. 162:16-163:9.)

Plaintiffs contend that, under the FLSA, Defendant was required to compensate ISAP Case Specialists for the entirety of their travel time (not just time in excess of the ISAP Case Specialist's ordinary home-to-office commute time). And Plaintiffs contend that they are similarly situated to other ISAP Case Specialists regarding this claim because Defendant's policy applied uniformly to all ISAP Case Specialists.

As with on-call time, Defendant primarily argues that Plaintiffs' claim should not be conditionally certified because its pay policy regarding travel to and from home visits was legal. Perhaps recognizing that this merits-based argument is not appropriate at the conditional certification stage, Defendant has also moved for partial summary judgment as to this issue. While Defendant's partial summary judgment motion is addressed below, I reiterate that it would be inappropriate to render a decision on the merits at the conditional certification stage.

Defendant offers two other arguments as to why Plaintiffs are not similarly situated regarding home visits. First, Defendant notes that certain ISAP Case Specialists never travelled directly between their homes and a participant's home for a home visit. This is so for two reasons: (1) in the Los Angeles, Houston and San Bernardino offices, there are certain ISAP

Case Specialists who handle all home visits, and, thus, the other ISAP Case Specialists in those offices do not conduct home visits; and (2) some ISAP Case Specialists choose not to travel directly between their homes and the participants' residences to conduct home visits, but instead start a day by driving to the office and clocking in, and then drive to the first home visit from the office, to which they return at the end of the day before commuting home. (Def.'s Opp'n to Pls.' Notice Mot. 20.)

Second, Defendant contends that the Named Plaintiffs and Opt-In Plaintiffs have been inconsistent as to when they clocked in and out when travelling to and from home visits. For example, while Named Plaintiff Alvarez stated that he understood that he was not supposed to clock in until he met with his first participant of the day, Named Plaintiff Tellado stated that he understood that he was supposed to deduct his ordinary home-to-office commute time. And some Opt-In Plaintiffs stated that they clocked in at home, before travelling to their first home visit, but later had these time entries changed by their ISAP Program Manager. (Def.'s Opp'n to Pls.' Notice Mot. 20-21.)

At the conditional certification stage, courts do not require that there be no individualized questions regarding a claim, or that every member of a proposed collective be identical in every experience related to that claim. Rather, whether individualized questions predominate over a common policy or practice challenged in the claim is left for final certification. See, e.g., Rocha v. Gateway Funding Diversified Mort. Servs., L.P., No. 15-cv-482, 2016 WL 3077936, at *9 (E.D. Pa. June 1, 2016) (granting conditional certification and noting that "courts in this Circuit have recognized that a defendant's claim or defense that individualized circumstances of employees render the matter unsuitable for collective treatment may be more appropriately reviewed during step two of the certification process") (collecting cases). Defendant's arguments

above—that certain ISAP Case Specialists never travelled directly from their homes to conduct home visits, or were inconsistent as to how they recorded their time—may prevail at the final certification stage. However, these arguments do not preclude conditional certification, as Plaintiffs have met their modest evidentiary burden by demonstrating that ISAP Case Specialists were subject to a single pay policy that allegedly violates the FLSA.

Accordingly, I will grant Plaintiffs' Motion for Conditional Certification, and conditionally certify the following collective:

> All current and former ISAP Case Specialists employed by BI Incorporated who performed work in the United States between March 18, 2015, and the present.

The parties will be directed to meet and confer regarding the content of the notice to be sent to the members of the collective, the appropriate method of sending notice,[7] and a deadline for additional opt-in plaintiffs to file their written consents.

**B.** ***Defendant's Motion for Partial Summary Judgment and Plaintiffs' Rule 56(d) Motion***

Defendant has moved for partial summary judgment on Plaintiffs' claims regarding home visits. Defendant urges that summary judgment is appropriate at this stage because there is no genuine dispute as to the material facts surrounding these claims. Plaintiffs respond that summary judgment would be premature at this time, as discovery has been limited to the issue of conditional certification, and has not been completed as to the merits. Accordingly, Plaintiffs have filed a motion under Federal Rule of Civil Procedure 56(d), urging me to defer consideration of Defendant's Partial Summary Judgment Motion until after the completion of discovery.

---

[7] The parties have indicated in their briefing on Plaintiffs' Notice Motion that they disagree as to whether the method of sending notice should be limited to first-class mail or should include electronic mail and posting in Defendant's offices. Plaintiffs and Defendant shall meet and confer as to this issue.

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may . . . defer considering the motion or deny it," pending discovery. Such motions, where properly filed, are granted "as a matter of course." St. Surin v. V.I. Daily News, Inc., 21 F.3d 1309, 1314 (3d Cir. 1994).

The Third Circuit has noted that Rule 56(d) motions are particularly appropriate where there is outstanding discovery. See Doe v. Abington Friends Sch., 480 F.3d 252, 258 (3d Cir. 2007). "If discovery is incomplete a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law." Shelton v. Bledsoe, 775 F.3d 554, 568 (3d Cir. 2015); see also Doe, 480 F.3d at 258 ("If discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion.").

Here, merits discovery has not been completed. The Scheduling Order I issued limited the first phase of discovery to that necessary for Plaintiffs to seek conditional certification of a collective action, with the understanding that full discovery on the merits would follow. Nevertheless, Defendant presses that the discovery taken thus far for the purpose of conditional certification necessarily and extensively reached the merits of Plaintiffs' claims, including Plaintiffs' home visits, such that the factual record is sufficient to decide Defendant's Motion for Partial Summary Judgment.

In its Motion for Partial Summary Judgment, Defendant contends that Plaintiffs' home-visit claims fail as a matter of law, because such time is not compensable under the FLSA. Plaintiffs disagree and contend that additional depositions and documents that were not obtained during the certification-related discovery period are necessary for them to fully demonstrate that

such time is compensable. Accordingly, I must determine whether the outstanding merits discovery sought by Plaintiffs is material to their opposition to Defendant's Partial Summary Judgment Motion.

As previously noted, the FLSA requires employers to pay minimum wages for compensable work, and overtime compensation for such work performed in excess of 40 hours per week. <u>See</u> 29 U.S.C. §§ 206(a), 207(a)(1). However, the FLSA does not define what activities qualify as compensable work.

In passing the Portal-to-Portal Act, Congress amended the FLSA to specify that two categories of activities are not compensable work:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities,

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). Thus, under the Portal-to-Portal Act, "employers are not required to compensate employees for the commute to and from work unless that commute is either the 'principal activity' for which the employee is employed or is 'integral and indispensable to such a principal activity.'" <u>Smith v. Allegheny Techs., Inc.</u>, No. 17-cv-911, 2018 WL 1135570, at \*2 (W.D. Pa. Feb. 28, 2018) (citing 29 U.S.C. § 254(a)); <u>Integrity Staffing Solutions, Inc. v. Busk</u>, 135 S. Ct. 513, 516-17 (2014)); <u>see also</u> <u>Lassen v. Hoyt Livery, Inc.</u>, 120 F. Supp. 3d 165, 174 (D. Conn. 2015) (noting that while "ordinary home-to-job-site travel" is not compensable under the Portal-to-Portal Act, the Act "does not change earlier definitions of compensable work," and thus holding that limousine drivers' drive from their homes, where the limousines were parked,

to their customers' pick-up locations was compensable). The Department of Labor has provided further guidance on what tasks constitute principal activities:

> [I]n order for an activity to be a "principal" activity, it need not be predominant in some way over all other activities engaged in by the employee in performing his job . . . . The "principal" activities referred to in the statute are activities which the employee is "employed to perform" . . . . Congress intended the words "principal activities" to be construed liberally in the light of the foregoing principles to include any work of consequence performed for an employer, no matter when the work is performed.

29 C.F.R. § 790.8(a). And, as to what activities are "integral and indispensable" to principal activities, the Supreme Court has explained that "[a]n activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Integrity Staffing Sols., Inc. v. Busk, 135 S. Ct. 513, 517 (2014).

Here, Plaintiffs posit that travel to and from a participant's home for a home visit is "integral and indispensable" to the home visits themselves, and is thus compensable under the FLSA. Plaintiffs contend that, to support this argument, they need additional discovery. For example, Plaintiffs maintain that they need to depose the ISAP Program Managers for whom Defendant produced declarations, and conduct a fact witness deposition of Jeffrey McGee, who has overseen the ISAP program since 2014.

I agree with Plaintiffs that such discovery could reveal facts that support Plaintiffs' claim that travelling to and from home visits is a compensable principal activity, or is integral or indispensable to a principal activity. Testimony from ISAP Program Managers and fact testimony from Mr. McGee could illuminate what ISAP Case Specialists were expected to do immediately before or during the drive to home visits, and how such tasks were related to what ISAP Case Specialists were expected to do during home visits.

Determining whether a certain task is a principal activity, or is integral and indispensable to a principal activity, is a fact-specific determination. Cf. Attansaio v. Cmty. Health Sys., Inc., 863 F. Supp. 2d 417, 429 (M.D. Pa. 2012) (denying an employer's motion to dismiss employees' FLSA claim, in which an employer argued that the activity at issue was not compensable under the Portal-to-Portal Act, and noting that whether the activity was "truly integral" to the principal activities for which the employees were hired "is a very difficult determination on the[] limited averments" in the complaint, and holding that "further factual development [was] warranted before it c[ould] be determined"). In arguing that travel to and from home visits is compensable, Plaintiffs are entitled to discovery beyond the limited discovery that has thus far been permitted. Accordingly, I will grant Plaintiffs' Rule 56(d) Motion and deny Defendant's Motion for Partial Summary Judgment without prejudice to refile following the completion of merits discovery.[8]

C.    ***Equitable Tolling for Potential Opt-In Plaintiffs***

Finally, Plaintiffs request that I equitably toll the statute of limitations for any potential opt-in plaintiffs, for the approximately 13 months that the Notice Motion has been pending.

The FLSA contains a statute of limitations, requiring an employee to commence any action alleging a willful violation within three years of the accrual date[9] (or within two years of

---

[8] Defendant also seeks Partial Summary Judgment on Plaintiffs' claims related to home visits under the Pennsylvania Minimum Wage Act. While not identical to the inquiry under the FLSA, whether travel time is compensable under the Pennsylvania Minimum Wage Act turns on a similar test: whether the travel time was "part of the duties of the employee," which "depend[s] on the nature of the employees' duties." Espinoza v. Atlas R.R. Constr., LLC, 657 F. App'x 101, 106 (3d Cir. 2016) (interpreting the Pennsylvania Minimum Wage Act). Accordingly, I conclude that Defendant's Motion for Partial Summary Judgment as to Plaintiffs' home visit claims under the Pennsylvania Minimum Wage Act is also premature.

[9] The accrual date is typically the end of the pay period for which the unpaid compensation should have been paid. See Genarie v. PRD Mgmt., Inc., No. 04-cv-2082, 2006 WL 436733, at *14 (D.N.J. Feb. 17, 2006) ("It is well settled that a separate cause of action for overtime compensation accrues at each regular payday immediately following the work period during which the services were rendered and for which the overtime compensation is claimed." (internal quotation marks and alterations omitted) (quoting Mitchell v. Lancaster Milk Co., 185 F. Supp. 66, 70 (M.D. Pa. 1960))).

the accrual date for a non-willful violation). <u>See</u> 29 U.S.C. § 255(a). The date on which the action is considered commenced differs for named plaintiffs and opt-in plaintiffs. For named plaintiffs—i.e. those plaintiffs "specifically named as a party plaintiff in the complaint" and who file their written consent with the complaint—the action is considered commenced when the complaint is filed. 29 U.S.C. § 256(a). However, for any opt-in plaintiff, the action is considered commenced only when that opt-in plaintiff files a written consent. <u>See</u> <u>id.</u> § 256(b).[10] Thus, while this action has already been "commenced" as to Named Plaintiffs Alvarez and Tellado, and the ten Opt-In Plaintiffs who have already filed their written consents, the statute of limitations has continued to run for any other potential opt-in plaintiffs within the collective that I have now conditionally certified, and it will continue to run until those opt-in plaintiffs file written consents.

In light of this, Plaintiffs request that I equitably toll the statute of limitations for these potential opt-in plaintiffs from the date that the Notice Motion was filed, April 3, 2017, until ten days after my decision on the Notice Motion (i.e., ten days from the date of this Opinion). This is appropriate, Plaintiffs maintain, because potential opt-in plaintiffs have not yet received a court-approved notice of this collective action, and thus, "through no fault of their own[,] have been and continue to be prevented from learning about the existence of this action and the ongoing expiration of their claims." (Pls.' Mem. in Supp. of Mot. for Equitable Tolling 4.)

Defendant responds that equitable tolling for potential opt-in plaintiffs is not appropriate, because: (1) routine delay in deciding a conditional certification motion and issuing a court-approved notice is not a circumstance that warrants the extraordinary remedy of equitable

---

[10] In this regard, a collective action differs from a class action under Federal Rule of Civil Procedure 23, in which the filing of the complaint satisfies the statute of limitations for all class members. <u>See, e.g.</u>, <u>In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.</u>, 795 F.3d 380, 409 n.27 (3d Cir. 2015).

tolling; and (2) the court lacks jurisdiction to equitably toll the statute of limitations for any potential opt-in plaintiffs, because such persons are not yet parties to this action, and thus any decision as to their rights would be an impermissible advisory opinion. I agree with Defendant's first argument and accordingly need not reach the second.[11]

Equitable tolling is a doctrine that "can rescue a claim otherwise barred as untimely by a statute of limitations when a plaintiff has been prevented from filing in a timely manner due to sufficiently inequitable circumstances." Santos ex rel. Beato v. United States, 559 F.3d 189, 197 (3d Cir. 2009). The doctrine is "read into every federal statute of limitation including the FLSA." Woodard v. FedEx Freight E., Inc., 250 F.R.D. 178, 193 (M.D. Pa. 2008).

However, the United States Court of Appeals for the Third Circuit has described equitable tolling as an "extraordinary" remedy to be applied "only sparingly." Santos ex rel. Beato, 559 F.3d at 197. "A plaintiff will not receive the benefit of equitable tolling unless [he] exercised due diligence in pursuing and preserving h[is] claim . . . ." Id. (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). The absence of prejudice to a defendant "is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, [but] it is not an independent basis for invoking the doctrine." Hedges v. United States, 404 F.3d 744, 753 (3d Cir. 2005) (quoting Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984)). And the burden of demonstrating that

---

[11] Neither the United States Court of Appeals for Third Circuit, nor any district court within the Third Circuit, has yet considered whether tolling the statute of limitations for potential opt-in plaintiffs constitutes an impermissible advisory opinion. However, one court of appeals and several district courts that have considered the question have agreed that tolling for potential opt-in plaintiffs is impermissible, because potential opt-in plaintiffs have not asserted, and may never assert, a claim. See United States v. Cook, 795 F.2d 987, 994 (Fed. Cir. 1986); see also Ruder v. CWL Invs. LLC, No. 16-cv-4460, 2017 WL 3834783, at *2 (D. Ariz. July 27, 2017) (noting that "only a few courts have considered this particular jurisdictional argument," but that "[a]ll who have done so have found a lack of jurisdiction"). While I need not reach this issue, I note that the position taken by these courts is supported by the Supreme Court's holding that the existence of potential opt-in plaintiffs does not make a putative collective action justiciable where the named plaintiffs' individual claims become moot. See Genesis Healthcare Corp., 569 U.S. at 73-78.

equitable tolling is appropriate lies with the party seeking to assert it. See Satterfield v. Johnson, 434 F.3d 185, 195 (3d Cir. 2006).

The Third Circuit has identified three "principal situations" in which equitable tolling is appropriate: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action, and that deception causes non-compliance with an applicable limitations provision; (2) where the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 591 (3d Cir. 2005). These situations, however, are not exclusive. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994). "In the final analysis . . . a statute of limitations should be tolled only in the rare situation where equitable tolling is demanded by sound legal principles as well as the interests of justice." Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999).

Here, Plaintiffs do not contend that the first or third "principal situations" identified by the Third Circuit are applicable: They do not contend that Defendant did anything to mislead potential opt-in plaintiffs or unnecessarily delay the issuance of a court-approved notice. And they do not argue that potential opt-in plaintiffs have asserted their rights in the wrong forum. Rather, Plaintiffs maintain that the second situation is applicable, arguing that the time their Notice Motion has been pending before me (now approximately 13 months), and the resulting delay in issuing a court-approved notice, constitute extraordinary circumstances preventing potential opt-in plaintiffs from learning of this collective action, and asserting their rights in it.

The Third Circuit has not addressed whether, in a collective action, any amount of time taken by a district court to decide whether to conditionally certify a collective action and issue a court-approved notice constitutes grounds for equitable tolling. However, several district courts

within the Third Circuit—and many more outside this Circuit—have considered the issue and reached opposite conclusions.

Some district courts within this Circuit have concluded that delays in deciding a motion for conditional certification, and in approving a notice to potential opt-in plaintiffs, constitute extraordinary circumstances meriting equitable tolling. See DePalma v. Scotts Co., LLC, No. 13-cv-7740, 2017 WL 1243134, at *3-8 (D.N.J. Jan. 20, 2017) (equitably tolling time that conditional certification motion was pending, a period of just over one year, because tolling would cause no prejudice to defendant and potential opt-ins had done nothing to cause the delay); Ornelas v. Hooper Holmes, Inc., No. 12-cv-3106, 2014 WL 7051868, at *10 (D.N.J. Dec. 12, 2014) (holding that equitable tolling due to delay in resolving a motion for conditional certification was appropriate, either because the delay was an "extraordinary circumstance" or because equitable tolling was otherwise "demanded by sound legal principles as well as the interests of justice"); Bosley v. Chubb Corp., No. 04-cv-4598, 2007 WL 9604965, at *1 n.1 (E.D. Pa. Feb. 20, 2007) (holding via footnote order that equitable tolling was appropriate "because of court delay in approving the Class Notice," as well as because of a "somewhat unreasonable" demand made by the defendant with regard to what to include in that notice, and noting that the defendant would not be prejudiced by tolling); Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 410-411 (D.N.J. 1988) (holding that a delay of more than 19 months in issuing a decision on notice motions "presented a facially compelling case for equitable tolling," but "put[ting] off a final decision on the issue until after the deadline for filing consents").

By contrast, other courts in this Circuit have held that equitable tolling for potential opt-in plaintiffs, based solely on delay in deciding whether to conditionally certify a collective action, is not appropriate. Such courts have concluded that this delay is not an "extraordinary"

circumstance, and does not prevent potential opt-in plaintiffs from pursuing their claims. See Vargas v. Gen. Nutrition Ctrs., No. 10-cv-867, 2012 WL 5336166, at *7-9 (W.D. Pa. Oct. 26, 2012) (declining to equitably toll the nearly one-year period that the filing of a motion for conditional certification was under consideration, noting that such delay was neither "extraordinary" nor attributable to wrongdoing on the part of the defendant, and that the delay did not "prohibit[] any of [the] putative members . . . from pursuing an individual or collective action for relief"); Titchenell v. Apria Healthcare Inc., No. 11-cv-563, 2012 WL 3731341, at *7 (E.D. Pa. Aug. 29, 2012) (noting that equitable tolling is not appropriate "[i]n the average case in which delay is attributable to the normal litigation process," and that lack of "timely knowledge of the existence of the collective action" and "an opportunity to file a written opt in form . . . are not extraordinary circumstances that justify equitable tolling"); Tompkins v. Farmers Ins. Exch., 14-cv-3737, 2015 WL 4931605, at *7 (E.D. Pa. August 18, 2015) (same).

I am mindful of the principled arguments supporting equitable tolling in a case such as this—in which the time Plaintiffs' Notice Motion was under consideration is less than optimal. But more convincing arguments—offered by Defendant as well as by other courts throughout the country—compel me to reach the opposite conclusion: that delay in issuing a court-approved notice, caused only by the time that a motion for conditional certification is under consideration by the court, is not an appropriate ground for equitable tolling.

The overriding principle controlling my analysis is that equitable tolling is an "extraordinary" remedy, to be applied "sparingly," Santos ex rel. Beato, 559 F.3d at 197, and only in "rare situation[s]." Jones, 195 F.3d at 159; see also Wallace v. Kato, 549 U.S. 384, 396 (2007) ("Equitable tolling is a rare remedy to be applied in unusual circumstances, not as a cure-all for an entirely common state of affairs."). Of the three "principal situations" the Third Circuit

has identified as meriting equitable tolling, the only arguably applicable one applies "where the plaintiff in some *extraordinary* way has been prevented from asserting his or her rights." Santos ex rel. Beato, 559 F.3d at 197 (emphasis added). But the passage of time while a conditional certification motion is under consideration is, unfortunately, not "extraordinary," but rather a routine aspect of litigation. See, e.g., Hintergerger v. Catholic Health Sys., No. 08-cv-380, 2009 WL 3464134, at *15 (W.D.N.Y. Oct. 21, 2009) (declining to equitably toll statute of limitations for 13-month period that plaintiffs' notice motion was pending, and noting that "the time for consideration of the conditional certification and related motions is reflective of an increasing caseload in this District and does not constitute an extraordinary circumstance for tolling purposes"). Thus, in the absence of some more extraordinary event, or some action on the part of a defendant to unnecessarily delay the issuance of a court-approved notice, equitable tolling is not appropriate.[12]

Moreover, in order for a plaintiff "to receive the benefit of equitable tolling" for a claim, he or she must have exercised "due diligence in pursuing and preserving [that] claim." Santos ex rel. Beato, 559 F.3d at 197. And while a potential opt-in plaintiff who has not received a court-approved notice may have no knowledge of *the collective action*, it cannot be said that a potential plaintiff had no knowledge of his or her *claim* or right to pursue that claim, either individually or collectively. As one district court has explained:

---

[12] Several of the cases cited by Plaintiffs in support of their Motion for Equitable Tolling highlight instances of such arguably extraordinary events. See, e.g., Antonio-Morales v. Bimbo's Best Produce, Inc., No. Civ. A. 8:5105, 2009 WL 1591172, at *1 (E.D. La. Apr. 20, 2009) (equitably tolling the statute of limitations for potential opt-in plaintiffs where the collective action had been stayed at the request of the U.S. Justice Department pending a criminal investigation); Yahraes v. Restaurant Assocs. Events Corp., No. 10-cv-935, 2011 WL 844963, at *2-3 (E.D.N.Y. Mar. 8, 2011) (equitably tolling the statute of limitations for potential opt-in plaintiffs where the collective action had been stayed pending the outcome of an investigation by the New York State Department of Labor). Other cases highlight instances where equitable tolling is arguably appropriate due to some action on the part of a defendant to unnecessarily delay the issuance of a court-approved notice to potential opt-in plaintiffs. See, e.g., Bosley, 2007 WL 9604965, at *1 n.1 (granting equitable tolling in part because of a "somewhat unreasonable demand" by the defendant as to what should be included in the notice).

> [T]he underlying right here is to overtime pay for hours worked over 40 per week. In contrast to those cases where the employer allegedly failed to post requisite notice of employees' legal rights, Plaintiffs here have offered no allegations or proof from which this Court can conclude that a reasonably prudent potential plaintiff would not have known of his or her right to receive overtime pay after 40 hours. Pursuit of that right is not dependent on the commencement or certification of a collective action, and a reasonably diligent person could have acted by pursuing an individual or collective action for relief.

Hintergerger, 2009 WL 3464134, at *15. Illustrative of this notion is the fact that, in this case, ten individuals opted in after the Complaint was filed, without having received a court-approved notice. Thus, while I am not unmindful of the Supreme Court's recognition of court-approved notice as a mechanism that, among other things, allows potential opt-in plaintiffs to "make informed decisions about whether to participate" in a pending collective action, Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989), I cannot conclude that all potential opt-in plaintiffs have been "diligent in pursuing and preserving [their] claims," merely because they have not received a court-approved notice of this action.

In sum, "time limitations prescribed by Congress must be treated seriously." Meyer v. Riegel Prod. Corp., 720 F.2d 303, 307 (3d Cir. 1983). In creating the "collective action" for employees to pursue FLSA claims collectively, Congress specifically departed from the class action mechanism of Federal Rule of Civil Procedure 23 and required any employee wishing to pursue an FLSA claim to either file his or her own individual action or affirmatively opt in to a collective action. Congress further specified that an employee's claim would not be considered "commenced" for purposes of the statute of limitations until he or she opts in. In establishing this statutory scheme, "Congress knew . . . that time would lapse between the filing of the collective action complaint by the named plaintiff and the filing of written consents by the opt-in plaintiffs, yet it chose not to provide for tolling of the limitations period." Woodard, 250 F.R.D. at 194. Indeed, in any putative collective action, a motion for conditional certification will be

pending for *some* amount of time. And in many (if not most) putative collective actions, the filing of the conditional certification motion will be preceded by *some* period of certification-related discovery. As these stages in the life of a collective action unfold, the statute of limitations for potential opt-in plaintiffs continues to run, even though such potential plaintiffs have not received a court-approved notice of the collective action. This will be true in every collective action.

This is not to say that equitable tolling is never appropriate for opt-in plaintiffs; only that equitable tolling should not be applied so broadly and routinely that the statutory scheme itself is altered. Tolling the statute of limitations for all potential opt-in plaintiffs, based only on delay in issuing a court-approved notice of the collective action, which will occur in every collective action, alters the statutory scheme and would be inconsistent with the directives of the Third Circuit and the Supreme Court that equitable tolling be applied sparingly and only in rare cases.

Accordingly, I conclude that Plaintiffs have not met their burden of demonstrating that equitable tolling for all potential opt-in plaintiffs is appropriate, and will deny Plaintiffs' Motion for Equitable Tolling. However, my decision is without prejudice to any individual opt-in plaintiff seeking equitable tolling based on that individual's circumstances. See, e.g., Titchenell, 2012 WL 3731341, at *8 (denying plaintiff's motion to equitably toll the statute of limitations for all potential opt-in plaintiffs, "without prejudice to the right of an individual plaintiff to seek equitable tolling at a later stage of the case").

### III.  CONCLUSION

For the reasons set out above, Plaintiffs' Notice Motion will be granted, and I will conditionally certify Plaintiffs' FLSA claims for a collective action. Plaintiffs' Rule 56(d) Motion will be granted and Defendant's Motion for Partial Summary Judgment will be denied

without prejudice to refile following the completion of discovery on the merits. Finally, Plaintiffs' Motion for Equitable Tolling will be denied.

An appropriate Order follows.